IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:15-CR-164 |
| | ) | |
| ALI SHUKRI AMIN, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

COMES NOW the Defendant, Ali Shukri Amin, by counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G."), respectfully submits this memorandum in aid of sentencing to this Honorable Court. Based on a consideration of the Sentencing Guidelines as well as the factors set forth in § 3553(a), and in particular Mr. Amin's young age, background and history, his extraordinary acceptance of responsibility, significant and continued cooperation with law enforcement authorities, and the fact that the guideline calculation dramatically overstates his criminal history category, a downward departure and variance are warranted, and a sentence of 75 months is appropriate in this case. In support of that sentence, Mr. Amin submits the following:

I.    **PRESENTENCE INVESTIGATION REPORT AND GUIDELINE CALCULATIONS.**

    A.    **Sentencing Guidelines Calculation**

Mr. Amin pleaded guilty on June 11, 2015, to one count of providing material support to a terrorist organization in violation of 18 U.S.C. § 2339B. Undersigned counsel has consulted with United States Probation Officer, Carla Coopwood as part of her

presentence investigation. Ms. Coopwood has calculated Mr. Amin's base offense level to be 26. Applying the three level downward departure for Mr. Amin's extraordinary acceptance of responsibility yields a recommended sentencing range of 46-57 months, due to a lack of any criminal history. Application of the Victim Related Adjustment for Terrorism ("terrorism enhancement"), however, increases Mr. Amin's total offense level to 35 and his Criminal History Category from I to VI, resulting in a recommended sentencing range of 292-365 months. U.S.S.G. §3A1.4. Because the maximum term of incarceration for this single conviction is 180 months, that becomes the starting "advisory guideline sentence". *United States v. Warsame*, 651 F.Supp.2d 978, 981 (D. Minn. 2009); U.S.S.G. §5G1.1(a).

**B.  Downward Departure under U.S.S.G § 4A1.3.**

Although the calculation of Mr. Amin's sentence guideline is technically correct, it nonetheless dramatically, misleadingly, and unfairly overstates his career criminal category to a staggering degree. Prior to the actions that resulted in the criminal charge in this case, Mr. Amin had no contact with law enforcement authorities whatsoever, much less an arrest or conviction. According to every witness interviewed by the defense he has always been a gentle, peaceful, and law-abiding citizen prior to being pulled into the blogosphere as a supporter of the Islamic State ("ISIS"). After law enforcement authorities were alerted to Mr. Amin's activities, and over a month prior to his arrest, he and his family, began cooperating with the criminal investigation without any promise for benefit. This cooperation continued uninterrupted following his arrest, when Mr. Amin began participating in formal debriefings, making efforts to communicate with ISIS supporters abroad, and, most recently (twice in the ten days prior to this sentencing), providing

evidence and information in connection with terrorist investigations abroad led by agents from foreign countries. Moreover, as a result of his waiver of the juvenile transfer hearing, acceptance of responsibility, admission of guilt, renunciation of ISIS, and ongoing cooperation, he has spared the United States significant expense and resources (Doc. 6, at 4), and represents virtually no risk of future criminal activity.

"If reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," a court has discretion to depart downward. U.S.S.G. § 4A1.3(b); *United States v. Moreland,* 437 F.3d, 424, 432 (4th Cir. 2006). In *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), the court made clear the broad discretion to depart downward extends in cases involving the terrorism enhancement: "A judge determining that § 3A1.4(b) over-represents the seriousness of defendant's past criminal conduct or the likelihood that defendant will commit other crimes always has the discretion under § 4A1.3 to depart downward at sentencing." Indeed, departures are "encouraged" where the applicable criminal history category fails to accurately reflect a defendant's true criminal history or the likelihood he will commit other crimes. *United States v. Dixon*, 318 F.3d 585, 588 (4th Cir. 2003).

In *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007), a jury convicted the defendant of two counts of making false declarations to a grand jury[1], obstruction of justice, and making false statements to an FBI agent. The prosecution arose from the defendant's repeated denials – including in front of two grand juries - of having traveled to Pakistan and possibly Afghanistan to participate in terrorism training including handling

---

[1] The trial court later granted the defendant's motion for a judgment of acquittal as to one of the two counts of making a false declaration. 501 F.Supp.2d at 751.

and discharging firearms or explosive devices to prepare for violent jihad. *Id.* at 750-51. At sentencing, the trial court applied the § 3A1.4 enhancement to increase Benkahla's offense level from 20 to 32, and his guideline range to 210-262 months. *Id.* at 757.

After determining § 4A1.3 allowed for a downward departure, the court in *Benkahla* addressed the disproportionate effect the terrorism enhancement had on the defendant's criminal history category: "For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." 501 F.Supp.2d at 759. As to the second factor, the court found that increasing Benkahla's criminal history category to VI also over-represented the likelihood he would commit other crimes, noting Benkahla was not a terrorist and did not share the characteristics or conduct of a terrorist, and therefore, lacked "the same likelihood of recidivism, the difficulty of recedivism, or the need for incapacitation." *Id.* Consequently, because Benkahla had no criminal record and had otherwise been a model citizen, the court determined his likelihood of ever committing another crime is infinitesimal", making him "the quintessential candidate for a downward departure under § 4A1.3." *Id.* Describing the disparity created by § 3A1.4 as "staggering", the court reduced Benkahla's suggested guideline range from a category VI to a category I, and his sentencing range from 210-262 months to 121-151 months, and imposed a sentence of 121 months. This resulted in a reduction of his ultimate sentence of approximately 50% based on the midpoint of his sentencing range. *Id.*

In *United States v. Aref*, 2007 U.S. Dist. LEXIS 17926, *3 (N.D.N.Y. 2007), the defendant was convicted of twenty-seven crimes, including one count of conspiracy to provide material support to a terrorist organization, and seven counts of attempting to

provide material support to a terrorist organization, all in violation of 18 U.S.C. § 2339B. These convictions arose from a protracted conspiracy to fund terrorist organizations overseas and to import surface to air missiles into the United States for the purpose of carrying out domestic terrorism. *United States v. Aref*, 2007 U.S. Dist. LEXIS 12228, at *6-11 (N.D.N.Y. 2007). Despite the elaborate nature of the conspiracy, the large number of convictions, the extensive planning involved to carry out the crimes, and its domestic aims, the court determined "that a criminal history category of VI does substantially over-represent the seriousness of [the defendant's] criminal history." *Id.* at *7.

> As indicated in the PSR at paragraphs 82 through 87, Hossain received zero total criminal history points as scored by the United States Probation Department. The credible and reliable evidence indicates that Hossain has provided for his family until his arrest through lawful employment and various capacities, and there is no indication that he has engaged in any other criminal activity in this country other than reported.

*Id.* at *8. Due to the defendant's lack of a criminal history and his personal characteristics, the court found "his circumstances to be extraordinary and that a downward departure is warranted to a criminal history category of I." *Id.* Because the court also exercised its discretion to run the sentences for all of the defendant's convictions concurrently, his sentence was effectively reduced from life imprisonment to fifteen years, or by over 50%. *Id.* at *22.

### 1. § 3A1.4(b) substantially over-represents the seriousness of Mr. Amin's past criminal conduct.

Applying a Criminal History Category of VI to Mr. Amin, dramatically and unfairly over-represents the seriousness of his criminal history. As an initial matter, the United States has stipulated that Mr. Amin has no criminal record. (Doc. 6, at 3.) Even more though, other than the allegations in this case, Mr. Amin has never even been accused of a

crime, has been a law-abiding citizen throughout his life, has never committed a violent act or possessed a weapon, and has always conducted himself in a peaceful, non-violent way. This stands in stark contrast to the defendants in *Benkahla* and *Aref*, who effectively received 50% downward departures in their ultimate sentences under § 4A1.3, despite their multiple convictions and even though they either traveled abroad for terrorist training and then lied about it to grand juries, or raised substantial sums of money with the intent of aiding domestic terrorists. Similarly, unlike those defendants who committed multiple crimes (at least 27 in *Aref*) when they were well past the point of maturity (and their fully developed brains were well-grounded in the real world implications of their choices), Mr. Amin is a child whose criminal conduct consists largely of prosthelytizing, developing funding schemes that never bore fruit, and accompanying an adult friend to the airport so he could join ISIS. Like the defendant in *Benkahla*, however, Mr. Amin has otherwise been a model citizen as the myriad of letters, records and recognition appended hereto attest. *See* Section II, *supra*, at 9-27.

Application of the § 3A1.4 creates a "staggering" increase in Mr. Amin's advisory guideline sentence of between 635% to 640% when the category VI sentencing range of 292-365 months is utilized.

> **2. § 3A1.4(b) substantially over-represents the likelihood that Mr. Amin will commit other crimes.**

Applying § 3A1.4(b) also substantially and unfairly over-represents the likelihood Mr. Amin would re-offend, which is virtually nil. Mr. Amin admitted his crimes during his first meeting with law enforcement in January, 2015, and through the time of his arrest, he and his parents met with FBI agents some five times. Shortly after his arrest Mr. Amin began debriefing with the United States and this cooperation has continued through the

present. Virtually all of this cooperation was provided with *absolutely no promised benefit*, and this is the strongest evidence Mr. Amin has taken full adult responsibility for his actions as a child. Even more, cooperating in ongoing investigations of ISIS supporters and terrorists, puts Mr. Amin at significant personal risk.

Although Mr. Amin has formally denounced ISIS, *see* Let. from Amin to Judge Hilton of August 19, 2015, at 2 (a copy of this letter is included in the Appendix ("App.") at 001-003), cooperating with law enforcement authorities in their pursuit of terrorists is compelling confirmation he has rejected ISIS, its goals, and the beliefs which led him to fall under the sway of older, online parasites who were instrumental in his radicalization. Because this denunciation parallels his continuing cooperation and complete acceptance of responsibility it reflects a sincere change rather than an convenient alteration to gain a sentencing benefit.

Relatedly, and in sharp contrast to the defendants in *Benkahla* and *Aref* who denied their many crimes, insisted on a trials then appealed their convictions, *see United States v. Aref*, 533 F.3d 72 (2d Cir. 2008), *cert. denied*, 556 U.S. 1107 (2009); *United States v. Benkahla,* 530 F.3d 300 (4th Cir.), *cert. denied,* 555 U.S. 1120 (2009), and apparently never cooperated with law enforcement, Mr. Amin's acceptance of responsibility goes far beyond providing substantial assistance. Mr. Amin admitted his crime and pleaded guilty. He waived his right to a juvenile transfer hearing, his right to be prosecuted on an indictment, his right to plead not guilty and have a jury trial, and his right to appeal, including an interlocutory appeal from an unfavorable transfer hearing. *United States v. Juvenile Male*, 554 F.3d 456 (4th Cir. 2008). These actions are unequivocal proof Mr. Amin has reformed and represents virtually no risk of committing other crimes.

In *Benkala* the defendant traveled abroad to train as a terrorist, fired high powered weapons during training, and took these actions with the explicit intent to join a terrorist organization. And for lying about his actions, including to a grand jury, he was properly convicted and punished. Even so, the sentencing court aptly found he was "not a terrorist" because he did "not share the same characteristics or the conduct of a terrorist," 501 F.Supp.2d at 759, and, therefore, concluded "there is no reason to believe he would ever commit another crime after his release from imprisonment." *Id.* These conclusions and reasoning apply with even greater force to Mr. Amin who possesses all of the same positive qualities, and more, *see* Point II, *supra*, at 9-27, but who, unlike Benkahla, owned up to his crime immediately, took full responsibility, pleaded guilty, and cooperated with ongoing investigations. If Benkahla was the "quintessential candidate for a downward departure" because of his low risk to reoffend *id.*, it would be hard to imagine anyone less likely to to commit other crimes or more deserving of downward departure than Mr. Amin, including Benkahla.

### 3. Conclusion.

Unlike the defendants in *Benkahla* and *Aref* who committed their crimes as adults, denied their guilt and demanded trials, Mr. Amin has taken adult responsibility for a crime arising from conduct he committed as a child. Because Mr. Amin has no other criminal record, § 3A1.4(b) dramatically over-represents the seriousness of his past criminal conduct. Moreover, because his personal qualities, and in particular his extraordinary acceptance of responsibility and substantial assistance, application of this enhancement also over-represents the likelihood he will commit other crimes, warranting a downward departure from category VI to category I under § 4A1.3, resulting in an advisory guideline

range of 168 to 210 months.

## II.   NON-GUIDELINE SENTENCING CONSIDERATIONS.

After calculating the guideline range, district courts then consider the factors in 18 U.S.C. § 3553(a) to determine whether a variance from the guideline range is warranted. *Gall v. United States*, 552 U.S. 32, 42 (2007). In this regard, there is no presumption of reasonableness attached to the guideline range nor a presumption of unreasonableness of a non-guideline range sentence. At the conclusion of considering the guideline range and § 3553(a) factors in relation to the facts of the case, "the court shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of § 3553(a). Consideration of these factors emphatically shows that a sentencing range of 168-210 months is far "greater than necessary" to implement the purposes of § 3553(a), and that a significant variance is warranted. For the reasons that follow, Mr. Amin respectfully requests that the Court grant a downward variance and impose a sentence of 75 months because of the truly unique circumstances of this case.

### A.   Nature and Circumstances of the Offense.

Mr. Amin pleaded guilty to providing material support to the Islamic State in violation of 18 U.S.C. § 2339B. The United States and the defendant have stipulated that Mr. Amin violated § 2339B by (1) using social media (including Twitter and online blogs) to advocate for support of ISIS and disseminate information aimed at garnering financial support for ISIS, and (2) helping RN, a coconspirator, to travel abroad for the purpose of joining ISIS. Mr. Amin acknowledges that this is a serious offense and he has indicated his acceptance of punishment by pleading guilty. (Doc. 7, at 2-5.)

Even so, it is significant that there is no evidence or allegation – either in the

stipulated facts for what has been made available to the defense – showing Mr. Amin's funding proposals led to any actual financial benefit for ISIS or that they had any meaningful impact in advancing that group's terroristic goals. Likewise, although Mr. Amin did prosthelytize RN and help facilitate his travel outside the United States to join ISIS, RN was an adult when this occurred and Mr. Amin was and remains a child. Moreover, RN had his own personal motivations traveling abroad, and it would be pure speculation to assert that but for Mr. Amin's assistance, he would not have left. The defense submits that RN would have gone without any assistance from Mr. Amin because RN was an adult, had the means travel himself, and he had been communicating independently with ISIS supporters outside the United States.

Mr. Amin is a bright, intellectually gifted, and academically inclined young man and had a promising future prior to becoming involved in online pro-ISIS activities. Even so, it is clear that his crime and related activities are a direct byproduct of his youth, his immaturity (both emotionally and socially) his struggle with significant physical illness and social disengagement, as well as a home life saturated in conflict and toxic influences that created a deep sense of physical and emotional fragility, and interfered with a natural assimilation into American culture. Report of Jeffrey Aaron, Ph.D., 8/17/15, at 3-7 (a copy of Dr. Aaron's report is included in the Appendix at 045-058, and his curriculum vitae is included App. 036-044). These factors, when coupled with his genuine religious convictions and growing frustration over perceived atrocities occurring in the Muslim world made Mr. Amin extremely vulnerable to the seductive but false promises of identity, purpose and fraternity offered by online radicals intent on advancing their own self-interests at the expense of others. App. at 051-057.

One of nearly dozen individuals who took an active role in Mr. Amin's radicalization – a Finnish man named "Abdullah"– recently granted public interviews to comment on his perception of Ali's radicalization. Erica Wenig, *New Details on Virginia Teen turned ISIS Regruiter: "We Were Hipsters We Liked ISIS Before It Was Popular"*, The Daily Caller, June 21, 2015 (a copy of this article is included in the Appendix at 150-53).[2] Abdullah, a Muslim convert, was an adult when he first engaged Ali, who was then about 16, and although he now apparently has renounced ISIS specifically, or violent jihad generally, when he was communicating with Ali, he was an avid and vocal supporter of ISIS and actively challenged Ali to become more radical and to join jihad. App. at 054. Critically, the influence and regard shown by Abdullah, and other older Islamic radicals who communicated with Ali, satisfied his needs for "validation, connection, and self-worth, and" these were provided "in a way that was … deeply desirable and compelling … and … contingent on" Ali increasing his espousal or increasingly "radical perspectives and supporting radical causes." App. at 054-055. Ali was influenced by several others, including "40 something" Uthman Buchs, a South African jihadist who treated Ali like a son and who's apparent interest and paternal caring was primer for his radical ideology. *Id* at 054.

A review of the various chats between Ali and some of the avowed jihadists – provided by the United Sates - fits the prototype of radicalization wherein the individual is taken through – or participates in – a multi-step process that identifies perceived grievances, becomes cognitively open to radicalization, and then is subjected to an

---

[2] This article can be found online at: http://dailycaller.com/2015/06/21/new-details-on-virginia-teen-turned-isis-recruiter-we-were-hipsters-we-liked-isis-before-it-was-popular/

increasingly radical ideology and set of radical solutions to explain and address the grievances. *United States v. Bell*, 2015 U.S. Dist. LEXIS 4447, *42 (M.D. FL. 2015). Ultimately, this process is designed to inspire the target to become mobilized toward the radical cause, including traveling and fighting if called. *Id.* Although it is clear that Ali considered and even intended abstractly to join ISIS, he never took any real action to do so and was openly chided by online detractors for the failure to travel even while encouraging others. Even Abdullah, who at one time made specific plans to travel to Syria himself, had doubts about whether Ali's sincerity to travel abroad. App. at 152.

In sum, Ali's entry into the internet community of ISIS supporters was gradual process propelled by his personal internal struggle, but aggressively encouraged by older more sophisticated radicals who had an agenda to radicalize and influence Ali.

**B.      History and Characteristics of the Defendant.**

As set out in the dozens of letters, declarations, records and reports, Ali is a uniquely bright, kind, polite and gentle, but vulnerable young man. *See generally* App. 004-035. He was born into conflict; a sickly baby whose parents separated before his birth, never to reconnect yet still blaming each other for Ali growing up without a father's love, guidance, and stability. App. at 047-051. In addition to Crohn's disease, Ali was born with thalassemia, sydactyly, and an eye movement disorder, and was subjected to four painful surgeries in his first four years of life. App. at 033-35, 065-066. Ali's multiple health problems created profound fear in his mother, Amani Ibrahim, and she developed a overbearing and over-protectiveness toward her son that stunted his emotional and social growth, and left Ali with deep sense of fragility and feeling of being "different". App. at 002-003, 049-051.

After leaving Sudan to make a better life for herself and young son, Ali's mother, Amani Ibrahim, discovered that existing in the United States came with its own challenges.[3] The first years were a financial struggle and she and her son had to live in a cramped basement with little support. App. at 004. Because she had to work long hours to make ends meet, Amani left her infant son in the care of virtual strangers who had little experience or training. *Id.* Eventually, she was joined in the United States by her own mother, and their lives began to improve.

At age four, Ali met his father, Shukri Abdelrahim, for the first time when he came to the United States to visit. App. at 005. By all accounts this was a very positive visit that left Ali happy and with a sense of hopefulness and connection to a man he had only heard about. According to Amani, Shukri promised to return soon to see his son and this made Ali extremely happy. *Id.* This joy, however, turned to immense sadness when Shukri failed to return. *Id.* His father, who will travel to the United States to attend his son's sentencing, now realizes that his own failures contributed to Ali's disillusionment and distorted beliefs:

> Because he is a Muslim boy, it is very important the involvement of his father from his early years, teaching him Islamic beliefs, ethics and principles. Absence of his father in his life created spiritual wound and misery and depression that is reflected in his desperate suicidal thoughts and falling a prey to the evil that exists on the internet. It is so clear to me that the absence of a father in his life and the conflict he had with his mother contributed to Ali trying to prove to his mother or himself that he is a strong man who can be decisive and wage war.
>
> I see now that despite the conflicts with Ali's mother, that I still carry fault for not having done more to remain in my son's life. I don't try to say I am responsible for his decision to support ISIS or to violate the law, but I can see that if I had been engaged with him I might have been able to show him the truth about Islam. My absence from his life left Ali adrift and looking for a new authority and associates in his surroundings and the internet trying to shape his adulthood.… A father is so important at this time to help a young Muslim man find peaceful and non-violent ways to making change.

---

[3] Both Mr. Amin and his mother are naturalized United States citizens.

> No matter what, I know I should have been there for Ali during this important time and I will regret this as long as I'm alive.

App. at 011.

Over the next several years, circumstances improved for Ali and his mother, and Ali grew into a kind and gentle boy with a proclivity toward academics and other intellectual pursuits. According to his fourth grade teacher, Christine Kessler, "Ali is one of those special few" students who "stand out fondly in [her] memory" among the many she taught. Like his teachers in later years, she accurately observed that "Ali was incredibly polite, engaged, liked by his peers, and especially brilliant", App. at 024-025, so bright in fact that when she learned he had not been accepted into the Cora Kelly Elementary School's gifted and talented program that year, she was greatly dismayed. *Id.* Tellingly, when he learned of this rejection, it was Ali to comforted Ms. Kessler. *Id.*

Around this time, Ali was first diagnosed with Crohn's disease. App. at 005, 014, 033, 0065. Although he had had significant gastrointestinal problems his entire childhood, this was the first time that it was formally labeled and began to be addressed. Given his mother's reactivity and fears, however, the formal diagnosis led to increased hypervigilence and foreboding, adding significantly to her own stress and Ali's sense of vulnerability. App. at 005-006, 013, 014, 033. According to noted child psychologist Jeffrey Aaron, Ph.D., who evaluated Ali for this sentencing:

> Crohn's disease significantly impacted Ali's development in a number of ways. Most directly, it led to repeated and at times lengthy school absences. While these did not lead to academic difficulties with the exception of the Governor's School program, it does appear that the absences interfered with Ali's social development. In the most obvious way, his absences limited the continuity of his engagement with his peers. As well, Ali's mother reported that her own anxiety and protectiveness, which had always been intense, further intensified. In discussions with me, Ali and his stepfather each independently described Ms. Ibrahim as extremely overprotective, and

14

Ms. Ibrahim also described herself in this way, citing her initial fears coming to a new and unknown country and fears then that someone would harm or kidnap her son, and the subsequent intensification of her protectiveness as a consequence of Ali's health concerns. Notable was some delay between initial symptoms and diagnosis, a moderately severe disease presentation with some atypical elements that did not respond to more common medical treatments and ultimately required surgical intervention.

Additionally, Crohn's disease is associated with failure to adequately gain and maintain weight, and for Ali, this was an ongoing concern. Not only were there health effects related to his nutritional status, but research on adolescent male development identifies small stature for boys as associated with lower self-esteem and greater social difficulties in adolescence, though not with long-term deficits in functioning.

Finally, Ali's absences from school affected his view of social relations at an important and formative time: He was absent for an extended period of time early in his 8th grade year for surgery, and he commented to me that he was disillusioned upon his return, having previously believed that he was socially connected with a number of groups and that "everyone was important," but believing upon his return that no one had noticed or cared about his absence. Ali stated to me that this reaction was transitory, and that he regained friendships and moved on, but this experience nevertheless appears important in his development.

App. at 048-049. Crohn's would come to play an increasingly significant role in Ali's social development (or lack thereof), emphasis on intellectual endeavors, and overall sense of vulnerability, and this made him susceptible to negative influences, especially those that appealed to his intellect and Muslim theology. App. at 054-055.

As he grew older, and despite the chronic fear and pain associated with his disease, Ali remained a very gentle, polite and compassionate boy. "As a child [he] was kind, always willing to share his toys, and gentle, he always had love for animals even going as far as crying when he saw a snake eating a fish and many other kids were throwing rocks at the snake…." App. at 015. These observations, made by Ali's maternal cousin, Saja Ibrahim, and were shared by every person who came to know Ali as a family member, *see,*

*e.g., id.* at 013 ("As a child he was quiet and very gentle"); *id.* at 014 ("Ali Amin … was always very gentle, soft spoken, and kind to everyone he met. He was a wonderful child growing up"); *id.* at 016 ("always very kind to me"); *id.* at 017_ ("Ali matured into a kind, sweet boy"); *id.* at 018 ("He was a smart boy and was very respectful towards his elders"), a pupil, *see, e.g., id.* at 020 ("He is a responsible, gentle, kind, smart boy… He was always willing to learn and was always respectful."); *id.* at 022 ("Ali clearly enjoyed my class, his classmates, and the school … and he seemed … to be flourishing psychologically despite his many health issues."), and a friend. *See, e.g., id.* at 030 ("he is a kind, soft spoken boy who wouldn't intentionally cause harm to anyone."); *id.* at 031 ("he had a friendly, humble and kind personality"); *id.* at 047 (teacher describing him "as a true pleasure to have … in class … intelligent"); *id.* (another teacher describing his performance as "outstanding" and being "very proud to have been his teacher"). His fourth grade teacher, Ms. Kessler, summed it up this way: "he … was truly an example of how a young person can be a shining beacon of holistic hope for our shared future." App. at 024.

Ali developed a deep sense of justice and compassion. He took time to understand other people's perspectives, and would respect those who disagreed with him. App. at 021, 031, 022-023. Ali treated all people with kindness and dignity, even when they disagreed, and always demonstrated he possessed a deeply compassionate heart. In 2007, when Ali was only ten, his cousin suffered a near fatal fall that sent him to the hospital. While visiting Ali held his older cousin's hand and prayed with her for her brother's safe recovery. This cousin, Gig Ragaa Abdulmoniem, who was fifteen at the time recalls how Ali's "loving supportive nature helped to ease the pain" her family was suffering. App. at 017.

Indeed, it was Ali's compassion for people even less fortunate than him that led him

to found the Best Buddies club at Osbourne Park High School. App. at 046, 126-128. Best Buddies was an extracurricular program designed to pair committed students with developmentally disabled peers to encourage and maintain their participation in school and community involvement. Since founding this club in 2013, Ali, and the other club members helped dozens of students per semester by taking them to school activities, including sporting events, and community functions. Prior to his arrest, Ali was serving as the Best Buddies vice-president and mentoring three peers.

At the time of his arrest, Ali was in his senior year at Osborn Park High School, carrying 3.478 grade point average, App. at 050-051, 111-113[4], and a participant in numerous advanced placement classes. For instance, in his junior year he was accepted into the Governor School through George Mason University ("Governor School"), a prestigious program for gifted students. Through this elite program, Ali took advanced placement courses in Calculus, Chemistry, Innovative Technology, and Mentoring. *Id.* To be accepted into this program, Ali had been required to demonstrate academic excellence, scholarship, and complete an extensive application including a written essay/research proposal.

At George Mason Ali was mentored by Bruce Averill, Ph.D., a noted chemist, to develop a research project and experiment with the hope of submitting the results for publication. The research project which was approved involved sonochemical sythesis of precious metals whereby nano-particals of the rare metal are isolated by a process similar to ultrasound and using extremely high heat. The project was submitted for publication and entered into a state competition. Dr. Averill, who formerly worked for the U.S. State Department in an international program involving counterintelligence, viewed Ali as an

---

[4] Enclosed at pages 111-128 of the Appendix is a partial set of Mr. Amin's records from Osbourn Park High School. The total record, which exceeds 100 pages, will be provided upon request.

incredibly bright and respectful student with a very promising future. App. at 022-023.

After gaining acceptance into the Honors program at the Governor's, Ali suffered a serious health crisis that resulted in him having to miss approximately five weeks of school in the first semester of his junior years. App. at 008, 050, 111. When he returned to school part way through the semester, Ali had fallen so far behind that he struggled to catch up. Initially, Ali attempted to make up ground in all dimensions – including several extracurricular scientific state-wide contests that he had applied for – by working harder and longer. Given his fragile health, however, Ali became exhausted and overwhelmed, and instead of catching up, he continued to lose ground. He then attempted to focus on his academics by shedding outside obligations, but by that point, he was too far behind and never recovered. Ultimately, at the end of that semester, he was forced to withdraw from this prestigious program, and experienced this event as a deeply personal setback. "This failure was significant in both its content (constituting a significant failure in the one domain in which he felt fully competent) and timing (shortly before the process of his radicalization began". App. at 048.

Ali's departure from the Governor's School was a clear turning point in his life. Although conflict had been growing steadily in his home for some time, it came to a head shortly after returning to Osbourn Park, and precipitated a heated argument with his mother that resulted in him leaving his home and living with an aunt and uncle for two months. App. at 007, 050. In this argument, Amani blamed her son for his failure, attributing it to his association with objectionable friends and his participation in objectionable activities. App. at 050. Ali was extremely distressed by this accusation as well as his mother's lack of compassion and refusal to acknowledge that his absence from school was the true cause

of his failure, and something he was unable to overcome despite his genuine effort. *Id.*

The schism with his mother – the central relationship in his life – was shattering for Ali, and he fell into a depression indicative of being overwhelmed by the complicated psychodynamics associated with pulling away from the emotionally fraught relationship with his mother for whom he shared a deep, but dysfunctional attachment. "He reported depressive symptoms at that time that included low mood, low self-image, excessive sleep, and intermittent passive suicidal ideation (wishing he were not alive)." App. at 050. Due to his Crohn's and upbringing, Ali was prone to depression, and the constellation of new, challenging experiences contributed to a sense of becoming lost. App. at 002, 033-034. "While at his uncle's house, Ali deepened a peer relationship that was central to his legal involvement," App. at 050, and experienced a growing interest in online communications with individuals who were advocating radical beliefs. "In the wake of the intensified conflict, living with his uncle's family, apparently depressed, and seeking solace, Ali appears to have intensified his engagement with the online jihadist community, both in the form of his own active posting and his personal contacts with" online radicals. *Id.* at 055.

In his report, Dr. Aaron sets forth the myriad of factors that resulted in Ali becoming drawn to radical beliefs, and eventually becoming radicalized. These include (1) his pre-existing vulnerabilities (chronic health problems, low/fragile self-esteem, ongoing family conflict and crisis, mother's hyper-reactivity, feeling "othered" or not fully assimilated, on the path to radicalization, and heightened susceptibility to external influences); (2) sincere and growing interest in his Islamic identity interwoven with juvenile acting out; (3) ready access to the internet and a receptiveness to becoming "connected" to a larger Muslim community that was vocally expressing grievances against Western authority (paralleling

Ali's own grievances against his family and sense of failure); (4) aggressive marketing by Jihadists; (5) intentional or incidental exploitation of Ali's particular vulnerabilities – in particular is growing need for validation - by older, more socially and politically savvy proponents of ISIS and violent jihad; and (6) unique circumstances of adolescent development including impairment in understanding long-term consequences, heightened experience of and response to emotions, deficits in judgment, participation in risk-taking behaviors, incomplete brain development, and susceptibility to immediate, situational influences, particularly peers. App. at 051-057. In the absence of responsible, engaged alternative adults who could address Ali's legitimate questions and frustrations, or at least temper them, *see id.* at 053*,* Ali increasingly became dependent upon the radical online community for answers and validation. *Id.*

Ali Amin deeply regrets the choices he has made and the impact that those choices have had on his family and his future. He is especially pained and ashamed by the growing recognition that the views he espoused with such force and certainty violate the very religious tenents on which he had previously premised his radicial beliefs. He also understands that his sense of certainty was a byproduct of youthful arrogance and a distorted need for validation, rather than religious devotion and true understanding. App. at 002-003.

Although Ali's radicalization took place over an extended period of time, in truth, the criminal actions are aberrational and entirely out of character. As noted by the people who have known him the longest and the best, he is a peaceful, gentle and kind young man. Much more indicative of his character and true moral code are his lack of any prior criminal or violent acts, his ready acceptance of responsibility for his crime, his early and continued

cooperation with law enforcement most of which came with no promised benefit, and his genuine openness to dialogue, learning from his mistakes, and amenability to change. App. at 002-003, 008, 010, 011-012, 022-023, 046-047.

**C.  The Seriousness of the Offense, Respect for the Law, and Just Punishment.**

Mr. Amin's crime is a serious offense that has already carried significant consequences for him and his family. In addition to being removed from his home, being incarcerated pending trial, and facing years in prison, Mr. Amin's actions breached a trust with his family, brought unwanted attention and hostility upon them (requiring them to move from their home), and has permanently stigmatized himself, his parents and his siblings. Mr. Amin's commission of this crime has also permanently altered what had been a very promising future. Prior to his arrest, Mr. Amin had been accepted to several institutions of higher education, including Virginia Commonwealth University, App. at 127-128, and had dreamed of earning a degree and starting a career in a science and technology field. He is a bright man who, by his own choices, has dramatically altered his future. He will likely be on a permanent "watch list," not be allowed to travel outside the United States, and have immense difficulty ever attending college or obtaining employment commensurate with his ability and intellect. These consequences are severe and long lasting. Mr. Amin also recognizes that he facilitated RN's travel abroad to join ISIS, which has dire consequences for RN's family, who may never see him again.

Mr. Amin has acknowledged the seriousness of his offense and respect for the law by admitting and taking responsibility for his crimes, providing immediate and comprehensive cooperation with authorities, and pleading guilty. Through these actions Mr. Amin has distinguished himself by showing he is capable of reform, willing to make

the right choices even if they have severe consequences, and that he is no danger to society. A just punishment, therefore, should take into account the fact that he is still a child who is still maturing, becoming more able to make good decision, and who is capable of making a meaningful contribution to society. A needlessly long sentence will be ruinous and counterproductive.

### D. Deterrence and Protection of the Public.

For the reasons set forth previously, *see* Point I, *supra*, at 1-8, counsel submits that Mr. Amin is no risk to commit future crimes. He has taken full responsibility for his actions, accepts that he will be punished, and has fully cooperated with authorities, evincing his respect for the lawful authority of the United States government. His crime is indicative of immaturity and the convergence of multiple factors, unique to youth, that will never arise again. Because he is not a terrorist, a needlessly long sentence will have no further deterrent effect or provide any additional protection to society. *Benkahla,* 501 F.Supp.2d at 759

### E. Unwarranted Sentence Disparities.

Section 3553(a)(6), directs district court judges to be mindful of "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr. Amin submits that the several cases discussed herein represent appropriate comparable sentencing outcomes, and a sentence of 75 months.

#### 1. *United States v. Conley*, 14-CR-163 (D. Colo.).

Shannon Maureen Conley pleaded guilt to one count of conspiracy, in violation of 18 U.S.C. § 371, referencing 18 U.S.C. § 2339B, for having provided material support to Al-Qaeda and its affiliates, including ISIS. According to the plea agreement, Ms. Conley met her coconspirator, Yousr Mouelhi on the internet in 2014 and thereafter, discussed

their mutual beliefs and support for violent Jihad. After Mouelhi advised Conley that was an active ISIS fighter in Syria, she agreed to travel to Syria to assist. Thereafter, on September 7, 2013, Conley joined the United States Army Explorers (USAE) in order to receive military training in tactics in firearms for the purpose of heling ISIS. On February 7-9, 2013, Conley traveled from Colorado to Texas to attend the USAE training. On March 29, 2014, Mouelhi purchased Conley an airplane ticket so that she could travel to Turkey. On April 8, 2014, Conley traveled to the Denver International Airport to fly to Turkey, but was apprehended before she could board the plan. *United States v. Conley*, 14-CR-163, Plea Agreement (Doc. 37), at 7-9 (D. Colo. Sept. 10, 2014).

When arrested, Conley was in possession of numerous items demonstrating proficiency and certifications of a number of specialized skills, including first aid/nursing certification, U.S.A.E. Certification, National Rifle Association certification and a first aid manual. *Id.* at 9. Agents also recovered DVDs of Anwar Al-Awlaki lectures, books about Al-Qaeda, its affiliates, and jihad, and shooting targets labeled with the number of rounds fired and distances. *Id.* Conley, who was 19 at the time of the crime, pleaded guilty and agreed to provide assistance to the United States. Her initial adjusted offense level was 35, based on the application of the terrorism enhancement. The district court sentenced Conley to 60 months imprisonment. *United States v. Conley*, 14-CR-163, Final Judgment (Doc. 79), at 7 (D. Colo. Jan. 26, 2014).

**2.** ***United States v. Wolfe*, 1:14-cr-213 (W.D. Tex.).**

Wolfe was charged with and pleaded guilty to one count of providing material support to a designated terrorist in violation of 18 U.S.C. § 2339B, based on his extensive efforts and planning to go to Syria to join ISIS for jihad. This planning included: (1)

obtaining new, more durable eye glasses that would hold up on the battlefield; (2) researching airline itineraries to travel to Europe on January 4, 2014; (3) creating a ruse to disguise the actual nature of his travel; (4) planning to raise money to finance the travel; (5) obtaining special certifications for his and his family's birth certificates to facilitate travel; (6) requiring his wife and two undercover officers to watch a video regarding foreign fighters in Syria in preparation for joining the fighting; (7) raising money to finance travel to Syria; (8) purchasing airline tickets to Dennmark; (9) communicating in codes to disguise his intentions from authorities; (10) obtaining an address in Turkey to send an advance package; and (11) going to the airport in Houston, Texas, to bard an international flight with the intent of joining a terrorist organization. *United States v. Michael Todd Wolfe*, 1:14-cr-213, Criminal Complaint, at 2-11 (W.D. Tex. June 6, 2014). During the planning of this trip, Wolfe showed he intended to bring his wife and two young children. Mr. Wolfe, who was 24 years old, pleaded guilty and received an 82 month sentence.

### 3. *United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014).

Pratheepan Thavaraja, a Sri Lankan native, was the principal procurement officer for the Liberation Tigers of Tamil Eelam ("LTTE"), a foreign terrorist organization. He was detained in Indonesia and extradited to the United States in 2007. In June 2009, he pled guilty to conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and conspiracy to bribe public officials. The district court applied the terrorism enhancement, elevating the defendant's base offense level to 40. Ultimately, although the suggested guideline sentence was 240 months, the district court sentenced him to 108 months imprisonment, a 55% downward variation from the Guidelines range. 740 F.3d at 257.

At the time of his apprehension, Thavaraja was 33 years old, had been engaged in a prolonged pattern of terroristic activity as the chief procurement officer of an entire terrorist organization, and attempted to bribe a public official when caught. In fact, the district court acknowledged that the defendant's "'function [in procuring arms for the LTTE] was critical and involved . . . procurement of deadly merchandise, almost inevitably used to injure, murder, maim, not only military but civilians.'" 740 F.3d at 258. As such, he was not only more deeply involved in a terrorist organization than Mr. Amin, but far more morally and criminally culpable. Despite his crimes, the court found the substantial downward variance was warranted because Thavaraja had no prior criminal record and "taught and worked with other inmates while in pretrial detention to the extent … the district court was convinced he was 'a person of substance and decency.'" 740 F.3d at 260.

4. ***United States v. Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009).**

In *Warsame*, the defendant – who was born in 1973 - was sentenced to 92 months imprisonment even though he traveled to Afghanistan before September 11, 2011, trained with al-Qai'da, and met and attended lectures by Osama bin Laden, continued to keep in contact with al-Qai'da after he returned to Canada and then moved to the United States. 650 F. Supp. 2d at 979-80. Warsame pleaded guilty to one count of conspiracy to provide material support to a designated foreign terrorist organization under § 2339B, and had the terrorism enhancement applied to his case, resulting in a base offense level of 35, criminal history category of VI, and a sentencing range of 292 to 365 months. Because he had no other criminal history, was not eligible for an enhancement for playing a leadership role or using a minor in the offense, and the government requested a downward variance from 180

to 150 months (defendant requested a sentence of 67 months), the court granted a 49% downward variance. *Id.* at 980-81.

### 5. Analysis.

Although there has been a proliferation of terrorism cases over the past decade, the particular ones cited herein are the most applicable comparison cases because each defendant were either found guilty of violating 18 U.S.C. § 2339B, or, as in *Conley*, conspiracy offense that referenced that statute. Each of these defendants eventually pleaded guilty, thereby saving the United States valuable resources, had little or no prior criminal history, and an initial base offense levels that exceeded the statutory maximum sentences. The sentences imposed for these similarly situated defendants ranged from 60 months for Conley, to 108 months for Thavaraja.

In contrast to each of these offenders, however, Ali is a child. Based on several LEXIS and internet searches it appears Ali he is the youngest person successfully prosecuted as an adult for violating § 2339B. Critically, he is far younger than all of the similarly situated defendants, other than Conley who was two years older. In contrast to Conley and Wolfe, who were caught at airports with tickets and intent to join a terrorist organization in a violent struggle, Mr. Amin never made any serious attempt to do so and the evidence suggests his ambivalence about actually traveling. Likewise, Warsame and Thavaraja, who were both about twice Mr. Amin's age, were prosecuted for their terrorist activities abroad. Even so, both received a downward variances of 49%, and 55%, respectively. In the final analysis, Mr. Amin's conduct is more akin to Wolfe and Conley, than Warsame and Thavaraja, and his sentence should reflect that similarity.

Consideration of the sentencing outcomes for these similarly situated defendants and the need to avoid unwarranted sentence disparities demonstrates that a significant downward variance is warranted in this case. Applying the 55% ratio used for reducing the most culpable of the four defendants (Thavaraja), results in a sentencing range for Mr. Amin of between 75.6 and 94.5 months (168 to 210 months x .45 = 75.6 to 94.5 months). Mr. Amin requests that this downward variance be applied in his case, and that he be sentenced at the low end of that guideline range, or to 75 months.

### III.     IMPOSITION OF A FINE

The Court is authorized to impose a fine in this case, pursuant to U.S.S.G. § 5K1.2, as a part of Mr. Amin's sentence. Mr. Amin requests that no fine be imposed by this Court because, as probation officer Carla Coopwood concluded, "Mr. Amin is unable to pay a monetary penalty." PSR at ¶ 80.

### IV.     RECOMMENDATION FOR FACILITY DESIGNATION WITHIN BOP.

The defense retained Joel Sickler, a widely recognized criminologist, to provide detailed assistance regarding what Mr. Amin will realistically encounter with federal incarceration, and to navigate how the BOP will process and manage this young defendant. We ask that the Court take these considerations into account at Mr. Amin's sentencing.

Mr. Sickler has worked in the field of sentencing and corrections for 35 years and currently heads the *Justice Advocacy Group, LLC*, a consortium of criminal justice professionals based in Alexandria, Virginia. The *Justice Advocacy Group* provides research for and advises criminal defense lawyers, probation departments and judges on federal sentencing issues and matters involving federal confinement. The firm also

provides advocacy services related to federal prisoner designation and classification, as well as adjustment to confinement.[5]

Mr. Sickler recently prepared a memorandum for my office regarding the upcoming process whereby Mr. Amin will be sentenced and assigned to a facility in which to serve a custodial sentence imposed. The material included discussion regarding security and medical classification considerations. Given an anticipated assignment (at least initially) to a medium-security facility, description of the appropriate medium-security facilities located in the mid-Atlantic region was provided for review. Three facilities are located relatively close to the Washington, D.C. Metropolitan area and Mr. Amin's family. The Court can provide a preferred facility assignment recommendation to the BOP within its Judgment Order. We respectfully include suggested designation language for the court in a separate section of this memorandum below - and ask the court to consider the importance of this recommendation, especially in light of Mr. Amin's young age, physical vulnerability, and significant health problems

*Designation and Security Classification*: After a sentence of imprisonment is imposed the BOP begins the process of designating the offender to a facility for service of the sentence (18 U.S.C. § 3621). The BOP retains exclusive discretion to assign prisoners to any of its facilities, but the Court may specifically make recommendations at sentencing that the BOP will indeed consider. 18 U.S.C. § 3621(4) (A) & (B). According to the BOP's

---

[5] Since 1980, Mr. Sickler has prepared over 2,500 evaluations for felony-level defendants facing sentencing in federal courts nationwide. He has submitted sentencing reports in 41 of the 93 federal judicial districts. Has received 40 federal court-appointments as a capital mitigation specialist and has testified as an expert regarding mitigation findings and recommendations in six federal jurisdictions. Mr. Sickler has visited 51 federal prisons and has advised clients with inmate matters in 86 of the Bureau of Prisons' 119 institutions. With experience as a correctional counselor in the District of Columbia's Department of Corrections and with prior tenure as Director of Client Services at the National Center on Institutions & Alternatives in Washington, DC, Joel Sickler has worked consistently for the past 35 years on federal sentencing and federal prison-related matters. *Justice Advocacy Group's* website is www.justiceadvocacygroupllc.com.

Designation and Sentence Computation Center (DSCC), there are no separate or specific facilities designed for juvenile defendants once they reach the age of 18. Given that Mr. Amin will be turning 18 within a month of his sentencing date, the DSCC will wait to issue his designation until that date. As such he will be designated to and serve his sentence with other inmates who will be much older.

When an offender is sentenced, the Court executes its Judgment order detailing the exact specifications of the defendant's sentence. An important part of the Judgment that will impact an eventual designation will be a recommendation by the Court regarding where Mr. Amin will serve his sentence, along with any programming suggestions, and we request the Court support a recommendation to a particular facility. The BOP's DSCC then selects the appropriate institution consistent with their security level determination. The assigned institution must also be the appropriate Medical Care Level facility as determined by the BOPs Office of Medical Designations and Transportation (OMDT).

*Security Classification*: In determining Mr. Amin's security level, the BOP designators take several factors into account, including age, education level, medical condition, offense level and prior criminal history. The *Inmate Security Designation and Custody Classification (BOP Program Statement 5100.08)* policy governs the classification process by utilizing the *Form BP-337, Inmate Load and Security Designation* data form. Given the information regarding Mr. Amin's case and background, the BOP's security level scoring (done on a points basis) reflects a total points score of 17, as per form BP-337. A total of 17 points scores a defendant at medium-security facility (inmates in a range of 16 to 23 points are medium-security). Given that Mr. Amin's offense is rated

"Greatest Severity," a Public Safety Factor (PSF) could also potentially be assessed to the scoring.

Additionally of concern is the possible application of a Management Variable (MGTV) of "Greater Security Risk" due to the presence of terrorism in this case. If the BOP assigns this MGTV to Mr. Amin's scoring he would be required to begin service of his sentence one level higher than he scored at the security level of medium, which would result in a high-security designation at a U.S. Penitentiary. We do not believe that given Mr. Amin's age and lack of criminal history that the BOP will actually assign this to the scoring. Because it remains a possibility, however, the Court's recommendation to support an assignment to a medium-security facility will have great constructive impact with the BOP as they consider the matter of designation for Mr. Amin.

*Medical Classification*: When an inmate has significant or chronic medical issues, such as Crohn's disease, the BOP's Office of Medical Designation and Transportation (OMDT) in Grand Prairie, Texas will review the medical information available in order to subsequently determine a Medical Care Level (MCL) classification - essentially MCL1 thru MCL4 based on the seriousness of one's condition. According to Mr. Sickler, this defendant may be assigned a MCL3 - this after detailed review of Mr. Amin's medical information and lengthy discussion with staff at the BOP's OMDT. As a MCL3 he would likely be limited to the Butner Medium facility in North Carolina, as it's the only MCL3 facility nearest to his home and family (for support in adjustment to incarceration and additionally to maintain close ties and support to facilitate transitioning back to the community in pre-release). The only other MCL3 facility in the country that is medium-security is located in Terre Haute, Indiana - quite a lengthy distance from home, family and

that critical support - *thereby making the Court's recommendation to the BOP all the more important* (as the BOP could very well designate him to Indiana should they so choose). Obviously the Butner facility is located much closer to his family in Northern Virginia and the Court's recommendation for that placement will be taken seriously by the BOP.[6]

Medical Care Level 3 assessment within the BOP, defines Care Level 3 inmates as follows:

> These inmates are fragile outpatients who require frequent clinical contacts to prevent hospitalization for catastrophic events. They may require some assistance with activities of daily living, such as bathing, dressing, or eating, but do not need daily nursing care. Other inmates may be assigned as "companions" to provide the needed assistance. Stabilization of medical or mental health conditions may require periodic hospitalization. **Examples of these medical conditions include *Crohn's (active/uncontrolled on meds),*** cancer in remission less than a year, advanced HIV disease, severe mental illness in remission on medication, severe congestive heart failure, and end-stage liver disease. Most Level 3 institutions are located adjacent to level 4 institutions, that is, Federal Medical Centers.

(Emphasis added.) Because of Mr. Amin's history of Crohn's disease and the need for regular medical examinations, it is likely that OMDT staff will determine him to be a MCL3. The best assignment to adequately maintain his health would be to FCI Butner Medium I with a strong Court recommendation accordingly, where Mr. Amin will be stabilized medically upon arrival and ideally continue in stable and monitored health.

Accordingly, Mr. Amin respectfully requests that the Court include the following language within its Judgment and Commitment Order concerning a BOP designation:

> Pursuant to Mr. Amin's term of imprisonment we request that the BOP regarding the facility designation in the case Mr. Amin, that he:
>
> • Be designated to FCC Butner's medium-security facility in North Carolina,[7] to facilitate meaningful family visitation and continued

---

[6] The other BOP MCL3 facilities are located in Texas, California and Indiana.

[7] In our opinion, FCC Butner Medium would be an ideal facility in which Mr. Amin can adjust successfully to the goals associated with his term of incarceration. It is close enough to his home and family to allow for

involvement in the lives of his family members. *Butner Medium* is well suited to manage the security considerations of the BOP regarding the particular circumstances of Mr. Amin's case background - with the added beneficial support of routine family visitations to assist in a rehabilitative adjustment to incarceration. ***And it importantly is a MCL3 facility adequate in nature to facilitate Mr. Amin's stable health, or be in a position to respond appropriately should any health crisis or situation arise***.

- If the BOP cannot accommodate Butner Medium as a designation for Mr. Amin - the medium-security facilities at either FCI Cumberland, MD or FCC Petersburg, VA is recommended - as alternative options providing similar considerations.[8]

## V.    COMMUNITY RE-ENTRY AND REHABILITATION.

To maximize Mr. Amin's reintegration and transition back to society upon completion of a sentence, the defense further requests that the Court include in its order a recommendation that Mr. Amin eventually be transitioned back to the community through a Residential Re-Entry Center for the maximum period allowed under the law.

The Second Chance Act (through 18 U.S.C. § 3621) authorizes the BOP to transfer inmates to community confinement during the last year of their term, provided they have demonstrated need for reintegration services. A 17-year old boy subjected to intense radicalization will greatly benefit from such services while residing in a Residential Re-Entry Center at his earliest eligibility by law. Such reintegration will be critical to address

---

regular and supportive contact with family members - and further appropriate given his anticipated Medical Care Level 3 classification within the BOP (the *Butner* facility specifically accommodating this care level). Mr. Amin's medical condition is outlined in detail within his PSR at ¶¶ 69-71, and in the Appendix at 033-035, 059-110). The court may reference Mr. Amin's medical considerations as reason for its designation recommendation.

[8]  Should lack of available bed space not accommodate placement at FCC Butner, or medical needs assessed by the BOP are found better served as MCL2 status, we respectfully ask that FCI Cumberland or FCC Petersburg be recommended to the BOP as alternative designation possibilities. Mr. Amin's medical condition will be a certain factor in his designation. Keeping him close enough to home and family for positive support toward rehabilitative and health goals associated with a term of incarceration is indeed an important consideration, and the court's recommendation along these lines will carry weight with the BOP.

the issues that led to Mr. Amin's incarceration in the first place, and will be key his successful return to the community without further offense or recidivism.

Pursuant to the Second Chance Act, Mr. Amine respectfully requests the Court to recommend that he be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center. Mr. Amin has been accepted to attend the *Youth Foundation for Networking and Friendship* (YFNF) program in Springfield, Virginia, upon his release. YFNF is the only known as "counter-radicalization" in the Northern Virginia area, and provides a complete set of services and therapy to assist young people in addressing the issues that led to their radicalization. App. at 129-149. YFNF brings together troubled young people from diverse backgrounds and provides disengagement from any radical influences or wayward encouraging elements present in one's life. YFNF provides a process for educating individuals toward a stable/productive path and engaging them focus.[9] Attendance at YFNF will be in addition to any conditions and requirements imposed on Mr. Amin by the Court or the United States Probation Office, and is available for inspection and review by his Probation Officer or other designee.

## CONCLUSION

For all these reasons, Mr. Amin respectfully requests that this Court impose a sentence of 75 months and no fine. Such a sentence is reasonable and just because it is a sufficient punishment but not greater than necessary. In addition, Mr. Amin requests that the Court include in its sentencing order a recommendation that Mr. Amin (1) be assigned to FCC Butner's medium-security facility in North Carolina to serve any period of

---

[9] For the Court's detailed review we have included with this memorandum both the synopsis material for YFNF and the direct letter from the organization's President formally accepting Mr. Amin into the program as a viable candidate they can help upon his release. App. at 129-149.

incarceration, and (2) be allowed to serve his final year in a community re-entry program in an approved Re-Entry Center.

Respectfully submitted,
Ali Shukri Amin
By Counsel

_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA 22030
(703) 691-8410
(703) 257-0252 (fax)
jflood@sfhdefense.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of August, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael Ben'Ary
Caroline H. Friedman
Assistant United States Attorney
Justin W. Williams United States Attorney's Office 2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
caroline.h.friedman@usdoj.gov
Michael.ben'ary@usdog.gov


_____/s/_____
Joseph T. Flood, VSB #71716
Sheldon, Flood & Haywood, PLC
10621 Jones Street, Suite 301-A
Fairfax, VA  22030
(703) 691-8410
(703) 257-0252 (fax)
jflood@sfhdefense.com